**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| John Doe<br><br>       Plaintiff,<br><br>  v.<br><br>The Alabama Department of Corrections, Gwendolyn Givens, Shafer, Artchie Giddy, Keith Roach, Deborah Toney, Chadwick Crabtree, William Streeter, Denice McKenzie, Jeremy Pelzer, and John Does 1-5,<br><br>    in their individual capacities,<br><br>      Defendants. | Case No.<br><br><br>**COMPLAINT FOR DAMAGES**<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR DAMAGES

Plaintiff John Doe is a resident of Alabama in his late twenties. Plaintiff brings this Complaint for violations of his civil rights against the Alabama Department of Corrections and its employees. Specifically, in July 2022, while incarcerated at Hamilton Aged & Infirmed Correctional Facility Plaintiff was denied medication assisted treatment for his diagnosed opioid use disorder, a recognized disability. Instead, Plaintiff was punished and transferred to Limestone Correctional Facility, where he was physically and sexually assaulted. Plaintiff brings this action to vindicate his rights under the Eighth Amendment, Fourteenth Amendment (due process), the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and Section 1557 of the Affordable Care Act.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because this action asserts one or more deprivations of federal constitutional rights by a state officer.

2.      This Court has supplemental jurisdiction over state law claims.

3.      Venue is proper in the Northern Division of the Middle District of Alabama under 28 U.S.C. § 1391(b)(1), because all Defendants are residents of Alabama and at least one resides in this District, and 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## JURY DEMAND

4.      Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

## PARTES

5.      **Plaintiff John Doe** was a prisoner incarcerated in various facilities in the State of Alabama. Plaintiff was in his late twenties when he was denied Medication Assisted Treatment for his opioid use disorder and subsequently brutally attacked and raped.

### Defendants

6.      Plaintiff sues each of the Defendants listed below in his or her individual capacity.

7.      Each of the Defendants listed below acted under color of law and within the scope of his or her employment when engaging in the misconduct described herein.

8.      Each of the Defendants listed below is above the age of majority.

### Defendant Facility Supervisors- Hamilton Aged & Infirmed

9.      **Defendant Gwendolyn Givens** was the Warden at Hamilton leading up to the events described in Plaintiff's Complaint until she retired after she was placed on mandatory leave

in May 2022. As Warden of Hamilton, Defendant Givens was responsible for the day-to-day operations of the prison, the safety and security of all prisoners at Hamilton, and the supervision of all subordinate employees.

10.     **Defendant Shafer** is a Captain who acted in capacity as the Warden at Hamilton leading up to and during the events described in Plaintiff's Complaint. As Captain, Defendant Shafer was responsible for the day-to-day operations of the prison, the safety and security of all prisoners at Hamilton, and the supervision of all subordinate employees.

11.     **Defendant John Doe 1** is a Warden at Hamilton leading up to and during the events described in Plaintiff's Complaint. As Warden of Hamilton, Defendant John Doe 1 was responsible for the day-to-day operations of the prison, the safety and security of all prisoners at Hamilton, and the supervision of all subordinate employees.

12.     Each of the Defendants identified above in paragraphs 9-11 acted in a supervisory capacity over other Hamilton employees at all times relevant to this Complaint. Further, the constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at Hamilton, which occurred with the consent of the Defendant Hamilton facility supervisors, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by their actions or by their deliberate indifference and failure to act.

### Individual defendants- Hamilton Aged & Infirmed

13.     **Defendant Artchie Giddy** was an officer at Hamilton leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at Hamilton and for monitoring and supervising the prisoners. Defendant Giddy was the hearing officer for Plaintiff's July 27, 2022 disciplinary hearing.

14.    **Defendant Keith Roach** was an officer at Hamilton leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at Hamilton and for monitoring and supervising the prisoners. Defendant Roach was the arresting officer for Plaintiff's July 27, 2022 disciplinary hearing.

### Defendant Facility Supervisors- Limestone

15.    **Defendant Deborah Toney** was the Warden at Limestone for the events leading up to Plaintiff's Complaint until August 1, 2022, when she was forced to retire due to allegations against her that she sexually harassed and assaulted Limestone employees. As warden, Defendant Toney was responsible for the day-to-day operations of the prison, the safety and security of all prisoners at Limestone, and the supervision of all subordinate employees. Defendant Toney's responsibilities as warden included ensuring adequate supervision and monitoring of prisoners, adequate classification of prisoners, appropriate housing assignments for prisoners, adequate staffing levels, appropriate discipline and deterrence of prisoner and staff misconduct, adherence by staff to the requirements of PREA, adherence by staff to search protocols, and adequate implementation of internal security audits.

16.    **Defendant Chadwick Crabtree** was the Warden at Limestone from August 1, 2022 until his arrest and indictment with drug manufacturing on April 20, 2024. As warden, Defendant Crabtree was responsible for the day-to-day operations of the prison, the safety and security of all prisoners at Limestone, and the supervision of all subordinate employees. Defendant Crabtree's responsibilities as warden included ensuring adequate supervision and monitoring of prisoners, adequate classification of prisoners, appropriate housing assignments for prisoners, adequate staffing levels, appropriate discipline and deterrence of prisoner and staff misconduct,

adherence by staff to the requirements of PREA, adherence by staff to search protocols, and adequate implementation of internal security audits.

17. **Defendant William Streeter** was the Warden of Limestone since August 1, 2022 leading up to and during the events described in Plaintiff's Complaint. As warden, Defendant Streeter was responsible for the day-to-day operations of the prison, the safety and security of all prisoners at Limestone, and the supervision of all subordinate employees. Defendant Streeter's responsibilities as Warden included ensuring adequate supervision and monitoring of prisoners, adequate classification of prisoners, appropriate housing assignments for prisoners, adequate staffing levels, appropriate discipline and deterrence of prisoner and staff misconduct, adherence by staff to the requirements of PREA, adherence by staff to search protocols, and adequate implementation of internal security audits.

18. **Defendant Denice McKenzie** was a Captain at Limestone leading up to and during the events described in Plaintiff's Complaint. As Captain, Defendant McKenzie was responsible for the safety of all prisoners at Limestone, security activities, and ensuring that subordinate staff were where they were supposed to be, carrying out their responsibilities and following ADOC and facility security procedures, including ensuring that staff were carrying out required monitoring of housing units, security checks, and contraband searches. She also had the responsibility for ensuring that prisoners were safely housed and the authority to adjust a prisoner's housing assignment.

19. **Defendant Jeremy Pelzer** was a lieutenant at Limestone leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at Limestone, and for monitoring and supervising the prisoners, as well as for supervising subordinate staff. As a lieutenant, he was specifically responsible for ensuring that staff were where

they were supposed to be, carrying out their responsibilities and following ADOC and facility security procedures. This includes ensuring that staff were carrying out required monitoring of housing units, security checks, and contraband searches. Lieutenants were also responsible for reviewing all incidents that were reported to them or occurred during their shift, including assaults, to ensure, among other things, that the perpetrators were correctly identified, that victims and perpetrators were safely housed, and that staff followed all procedures in relation to the incident.

20.      **Defendant John Does 2-5-** are Captains or lieutenants at Limestone leading up to and during the events described in Plaintiff's Complaint. They were responsible for the safety and security of the prisoners at Limestone, and for monitoring and supervising the prisoners, as well as for supervising subordinate staff. They were specifically responsible for ensuring that staff were where they were supposed to be, carrying out their responsibilities and following ADOC and facility security procedures. This includes ensuring that staff were carrying out required monitoring of housing units, security checks, and contraband searches. They were also responsible for reviewing all incidents that were reported to them or occurred during their shift, including assaults, to ensure, among other things, that the perpetrators were correctly identified, that victims and perpetrators were safely housed, and that staff followed all procedures in relation to the incident. They also had the authority to adjust a prisoner's housing assignment.

21.      Each of the Defendants identified above in paragraphs 15-20 acted in a supervisory capacity over other Limestone employees at all times relevant to this Complaint. Further, the constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at Limestone, which occurred with the consent of the Defendant facility supervisors, who personally knew about, facilitated, approved, and/or condoned this

pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by their actions or by their deliberate indifference and failure to act.

22.     **Defendant the Alabama Department of Corrections-** Defendant ADOC is the state agency that was legally responsibility for the custody of Plaintiff. ADOC is responsible for the contracting of medical services for all ADOC facilities, including Hamilton. At all relevant times, ADOC acted through its employees, staff, and agents.

## FACTUAL ALLEGATIONS

**A. Defendants failed to offer Plaintiff Medication Assisted Treatment for his opioid use disorder and instead punished Plaintiff when he self-medicated**

23.     Plaintiff was arrested in February 2020 and convicted for several offenses including drug possession. Plaintiff was initially housed in a county jail.

24.     Plaintiff was transferred to serve time in the state prison system. On November 10, 2021, Plaintiff went through intake at Kilby Correctional Facility.

25.     On his intake form at Kilby, Plaintiff admitted to a history of substance abuse, including methamphetamines, heroin, and cocaine.

26.     Plaintiff noted that he had previously received substance abuse treatment at two facilities in Alabama prior to his incarceration.

27.     Plaintiff was then transferred to the Alabama Therapeutic Education Facility (ATEF).

28.     At intake to the ATEF, Plaintiff tested positive on his initial drug screening test.

29.     At ATEF, Plaintiff was placed on a mental health caseload. On January 19, 2022, ADOC's mental health treatment plan for Plaintiff diagnosed Plaintiff with opioid use disorder.

30.     ADOC's mental health treatment plan for Plaintiff also noted that he had previously received substance abuse treatment at two facilities in Alabama prior to his incarceration.

31.     On June 14, 2022, Plaintiff was housed at Hamilton Work Release Center.

32.     Plaintiff had been assigned a job in Haleyville, Alabama and was to start work on July 18, 2022.

33.     Hamilton Work Release Center drug tested Plaintiff on July 12, 2022. Plaintiff tested positive for buprenorphine, a medication that is used to treat opioid addiction.

34.     Plaintiff had been self-administering suboxone and slowly tapering himself off of it. Prior to his incarceration, multiple medical providers proscribed suboxone to Plaintiff to assist him with his addiction.

35.     Due to the positive drug test, on July 14, 2022, Plaintiff was taken to Hamilton Aged and Infirmed Center, received a disciplinary violation, and was ordered to undergo a reclassification hearing.

36.     The disciplinary report stated Plaintiff was found to be in violation of Rule 928, use of or under the influence of alcohol, narcotics, or other intoxicants.

37.     During this time, Plaintiff tested positive for Covid and was severely sick and laid in a bed for twelve days during the one of the hottest months on record in Alabama without a fan or air conditioning.

38.     On July 27, 2022, Plaintiff received a reclassification hearing.

39.     Plaintiff pointed out that the urine drug sample test Defendants relied on to reclassify Plaintiff was certified by a notary public whose commission had expired. Therefore, Defendants could not rely on the urine drug sample test.

40.     Defendant Giddy, the hearing officer, and Defendant Roach, the arresting officer, found Plaintiff guilty and ordered Plaintiff to be reclassified.

41.     The hearing officers ordered Plaintiff to be reclassified. That same afternoon Plaintiff was ordered transported to Limestone Correctional Facility.

42.     Plaintiff's reclassification hearing was pre-determined against Plaintiff. The officer who transported Plaintiff to Limestone informed Plaintiff that he had been told yesterday he would be transporting Plaintiff to Limestone.

43.     Defendants the ADOC, Givens, Shafer, and John Doe 1, knew many prisoners at Hamilton work release camp and at Hamilton suffer from substance abuse disorders and require substance abuse treatment.

44.     Despite knowing this, Defendants the ADOC, Givens, and Shafer failed to offer prisoners, including Plaintiff, any medication-assisted treatment ("MAT") for substance abuse treatment.

45.     By failing to offer MAT to Plaintiff as an option for substance abuse treatment, Defendants the ADOC, Givens, and Shafer caused Plaintiff to have to resort to self-medication in order to treat his substance abuse problem and prevent himself from relapsing and using harder drugs.

**B.  MAT is the evidence-based approach for addressing substance abuse treatment**

46.     With MAT, physicians prescribe a maintenance dosage of FDA-approved medications, such as buprenorphine (suboxone), methadone, or naltrexone, which blocks the opioid receptors in the brain and thereby suppress drug cravings and opioid withdrawal symptoms.

47.     Patients suffering from opioid use disorder need MAT to achieve long-term recovery. Unlike other forms of addiction, like alcohol addiction, opioid use disorder fundamentally alters the chemical structure of the brain, making it almost impossible for a patient to overcome his opioid use disorder without medication by going, for example, "cold turkey."

9

48.     The results of treatment with MAT are dramatically superior to other treatment options, with studies showing improved retention in treatment, abstinence from illicit drugs, and decreased mortality.

49.     Both buprenorphine and methadone bind tightly to the opioid receptor so that someone taking one of these medications is not able to feel a "high" from taking heroin or fentanyl because those drugs are not able to activate the opioid receptor. Both methadone and buprenorphine also facilitate extinction learning, because patients learn that they will not get the same "high" from taking drugs like heroin or fentanyl.

50.     Providing MAT for people in jails and prisons is lifesaving. For example, the risk of unnatural death (including overdose, suicide, and other preventable causes) was eighty-seven percent lower for incarcerated people on MAT compared to incarcerated people with opioid use disorder and not on MAT.

51.     The American Society of Addiction Medicine, the leading professional society in the country on addiction medicine, recommends treatment with MAT for people with opioid use disorder in the criminal justice system. The National Commission on Correctional Health Care has also adopted a position statement calling for the use of MAT. In a 2018 report, the National Sheriffs' Association and the National Commission on Correctional Health Care (NCCHC) recommended that "all individuals with OUD [opioid use disorder] should be considered for MAT" while incarcerated.

52.     The U.S. Department of Justice recently concluded that denial of MAT to incarcerated people in a New Jersey county jail amounted to an Eighth Amendment violation.

53.     States that implemented MAT demonstrate that the treatment allows prison systems to realize cost savings and save lives. In the Maine prison system, for example, MAT was

introduced in 2019. About forty percent of prisoners across the prison system are now administered medications to treat opioid use disorder. Fatal overdoses have dropped sixty percent. In addition, the black market for drugs dried up. According to the Maine Department of Corrections, drug smuggling, violence and suicide attempts inside state prisons all plummeted.

**C. Defendants the ADOC, Givens, Shafer, and John Doe 1 were on notice Plaintiff suffered from substance abuse treatment and should be offered MAT**

54.     Defendants the ADOC, Givens, Shafer, and John Doe 1 knew many prisoners at Hamilton work release camp and at Hamilton suffer from substance abuse disorders and require substance abuse treatment.

55.     Drug possession is the leading cause of incarceration in Alabama prisons.

56.     Drug offenses were the leading driver in the ADOC admissions every year between 2016 and 2019.

57.     In 2021, the ADOC estimated that 75-80% of the people in its custody have substance use disorder.

58.     In addition, the ADOC has a growing opioid epidemic within its walls.

59.     Following its investigation beginning in 2016, the DOJ issued extensive Notice Letters to the ADOC in April 2019 and July 2020 outlining the ADOC's failures relating to the protection of prisoners.

60.     The Department of Justice's April 2019 Notice Letter reported that agents of ADOC's Intelligence and Investigations Division ("I&I") Division, including the I&I Director, stated that "drugs are the biggest problem in prison" because prisoners are "wigging out" and harming others.

1.     One ADOC investigator stated that "drugs are the biggest driver of violence in Alabama's prisons."

2.      Another investigator saw five or six prisoners laid out in a hallway at Bullock after smoking the same drug and thought it looked like a "triage in a warzone."

3.      As the Department of Justice's Notice Letter observed, the growing spread of flakka through the Alabama prisons can be traced by its increasingly frequent appearance in autopsy reports.

4.      A review of autopsies from 2017 and the first half of 2018 revealed that the substance was present in many facilities, including Bibb, Bullock, Draper, Elmore, Fountain, and Staton.

5.      A review of autopsy reports from prisoner deaths dating December 2016 through August 2018 revealed that at least twenty-two were caused by "synthetic cannabinoid toxicity" overdoses.

6.      The problem grew from three deadly overdoses in 2016, to nine in 2017, to more than ten in the first half of 2018.

7.      Revealing how exponentially the problem has grown, between March 2020 and November 2022, there were seventy-two suspected drug-related deaths of ADOC inmates.

**D. Plaintiff was transferred to Limestone Correctional Facility, L dorm, where he was physically and sexually assaulted**

8.      On July 27, 2024, Plaintiff was placed in Limestone Correctional Facility in L housing dormitory.

9.      Plaintiff observed ubiquitous drug use inside L dorm. Drugs were easier to obtain than food.

10.     Prisoners were heavily armed and carried axes or free world hunting knives, as opposed to prison made knives. Prisoners also carried zip ties and used them to tie up and assault other prisoners.

11.     When Plaintiff first arrived in L dorm, Plaintiff observed another prisoner being tied-up, held captive, and beaten by other prisoners in a cell across from him for several days until this prisoner died.

12.     In early August, a prisoner in a neighboring cell falsely accused Plaintiff of stealing drugs worth $1,300.

13.     As a result, prisoners who are members of the Gangster Disciples placed a hit on Plaintiff. A prisoner named Ernest Little, who is a member of the Bloods, met with the Gangster Disciples and stated he would take over the hit on the behalf of the Gangster Disciples.

14.     Little was known by his prison name Six Nine because he was six foot nine inches tall.

15.     Little contracted the hit on Plaintiff to two prisoners whose prison names are Cheek and Chevy.

16.     On August 7, 2022, Plaintiff was assaulted by another prisoner. Plaintiff was using a wall phone and did not hang up the phone when the other prisoner told him to.

17.     Plaintiff is white. The majority of the prisoners housed in L dorm are black. Black prisoners routinely beat white prisoners in L dorm and tell them they do not have the same privileges, such as using a wall phone, as black prisoners.

18.     Prisoners are frequently assaulted in bathrooms in the L dorm because there are no cameras there.

19.     Plaintiff was so fearful of assault that he carried his state issued electronic tablet with him into the bathroom in order to call family members while he used the bathroom in order to protect himself from assault.

20.     On August 10, 2022, Plaintiff was assaulted by the same prisoner in the morning as he was going into the bathroom.

21.     Plaintiff suffered a broken rib and cuts to his face. Plaintiff was taken to the healthcare unit where he received seven stitches.

22.     Plaintiff was sent back to the same dorm where he had been assaulted.

23.     Healthcare staff did not take an x-ray of Plaintiff.

24.     On August 17, 2022, Plaintiff was asleep when he was assaulted for a third time. A prisoner, Cheek, hit Plaintiff hard in the left temple.

25.     Cheek dragged Plaintiff into a nearby cell. Chevy and Little joined the physical assault on Plaintiff and continued to beat him.

26.     In addition to physically assaulting Plaintiff, Cheek, Chevy, and Little took turns raping Plaintiff.

27.     After he was physically and sexually assaulted, Plaintiff went out and spoke to an officer stationed in the L dorm cubicle.

28.     It was obvious Plaintiff has just been physically assaulted. Plaintiff was obviously and visibility injured. He had numerous bruises, cuts, and swelling on his head.

29.     Plaintiff did not tell the cubicle officer that he had just been assaulted because he feared the cubicle officer would immediately repeat everything he said to gang members inside L dorm.

30.     That same day, Plaintiff spoke to Defendant McKenzie in her office. Defendant McKenzie told Plaintiff he could request placement in protective custody if he continued to feel threatened.

14

31.     At that time, Plaintiff did not request placement in protective custody because he feared that gang members would believe he had snitched on them and would retaliate further, killing him.

32.     Defendant McKenzie did not order an investigation of the assault on Plaintiff or review video camera footage to see who had attacked Plaintiff.

33.     Defendant McKenzie did not change Plaintiff's housing assignment or take steps to protect him by moving him to another housing dorm. Instead, Defendant McKenzie sent Plaintiff back to L dorm.

34.     Defendant McKenzie is affiliated with the Bloods gang and assists the Bloods at Limestone, including Little, to bring drugs into the facility.

35.     Between August 17-20, 2022, Plaintiff requested several times to be sent to the health care unit. He filled out medical requests slips but the Limestone medical providers never called for him to go the health care unit.

36.     Correctional officers and healthcare providers did not allow Plaintiff to go to the healthcare unit and did perform a body chart[1] on Plaintiff's injuries in an effort to cover up the assault on Plaintiff by allowing Plaintiff's injuries to heal before documenting them.

37.     On August 20, 2022 Plaintiff's mother called Limestone and spoke to Defendant McKenzie. Plaintiff's mother knew Little had placed the hit on Plaintiff and attempted to inform Defendant McKenzie of this. Defendant McKenzie kept cutting Plaintiff's mother off from talking and would not permit her to say Little's name in an effort to protect Little.

---

[1]     A "body chart" is completed by a medical professional following physical interactions with prisoners. The form documents the nature and scope of any visible injuries or marks on a prisoner. It also usually contains a short statement from the prisoner detailing why a body chart was completed.

38.     Three days after his assault Plaintiff's head was visibility and abnormally swollen. Plaintiff was lethargic and could not stay awake, could not see, could not eat, and suffered an intermittent nose bleed for three days. These are classic signs of a head concussion.

39.     Plaintiff 's mother called the ADOC headquarters in Montgomery and spoke to Law Enforcement Services Division agent Kelly Smith. Agent Smith called Limestone and requested Limestone officers perform a body chart on Plaintiff have a nurse look at Plaintiff's head.

40.     Plaintiff was taken to the Limestone health care unit. Plaintiff told a nurse that he thought something was broken inside his head. The nurse agreed with Plaintiff and said she would order an x-ray for Plaintiff.

41.     The Limestone nurse did not follow up and call Plaintiff to the healthcare unit for an x-ray. Plaintiff did not receive an x-ray for his head injury for approximately two weeks.

42.     Little continued to threaten Plaintiff. Little extorted Plaintiff, telling him that unless he repaid the $1,300 he had allegedly stolen from Gangster Disciples, Little would kill Plaintiff.

43.     On August 20, 2022, Plaintiff left L dorm and went to the shift office and spoke to Defendant Pelzer. Plaintiff requested to be placed in protective custody for his safety and to protect him from assault from prisoners in L dorm.

44.     Defendant Pelzer laughed at Plaintiff and said he could not put Plaintiff in protective custody for his protection.

45.     Defendant Pelzer said the only reason he could put Plaintiff in protective custody was if Plaintiff voluntarily accepted to receive an Administrative Regulation 403 disciplinary violation and allow all of his goodtime to be taken away. Defendant Pelzer made Plaintiff return to L dorm and took no further steps to protect Plaintiff.

46.     Little continued to threaten Plaintiff that he would kill him if Plaintiff did not pay $1,300.

47.     Over the next several days, Plaintiff continued to go to the shift office and requested to be placed in protective custody because his life was in danger. Each time, Defendant Pelzer taunted Plaintiff, asking if Plaintiff "was running from his husband," inquire if "Plaintiff was bleeding from his ass," told Plaintiff "to learn how to fight," and told Plaintiff "to get a knife" to protect himself.

48.     On August 22, 2022, Plaintiff still had not received medical attention. Five days after he was assaulted, Plaintiff could not chew food because it hurt his eye and temple and he was still nauseous.

49.     During this time, Plaintiff's mother made repeated phone calls to Limestone to plead for Limestone officials, including Defendant McKenzie, to provide Plaintiff with medical care and to move Plaintiff out of L dorm.

50.     Plaintiff's mother contacted everyone from the Limestone facility level, to the Governor's mansion, to Homeland Security.

51.     On August 31, 2022, Little texted Plaintiff's wife, threatening to kill Plaintiff if she did not pay $1,300.

52.     On August 31, 2022, Plaintiff's mother called the ADOC's Montgomery headquarters, again pleading for her son be placed in administrative segregation because Little was extorting Plaintiff's wife.

53.     Agent Smith, of LESD, ordered Plaintiff moved to administrative segregation.

54.     On August 31, 2022, Plaintiff was moved to administrative segregation. Plaintiff told Defendant McKenzie that Little was the prisoner who ordered the hit on him on August 17, 2022.

55.     Despite Defendant McKenzie knowing that Little placed the hit on Plaintiff, Defendant McKenzie never charged Little with a disciplinary violation, investigated Little, reported Little to the LESD, or referred Little to prosecution.

### E. Limestone Supervisory Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer, and John Does 2-5 were on notice of the widespread threat of physical and sexual assault to Plaintiff in L dorm

56.     As set forth in more detail below, Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer, John Does 2-5 were aware of an enduring and widespread crisis of violence at Limestone. The attacks that Plaintiff suffered were a direct and foreseeable result of each Defendant's inaction in the face of this violence, including a longstanding failure to discipline and segregate perpetrators of violence; to respond to fears and threats of violence; to confiscate and control the possession of contraband weapons; to monitor and control the movement of prisoners in L dormitory and prevent them from harming other prisoners at the facility; to identify and address instances of sexual assault and prevent retaliation against prisoners who reported sexual abuse; and to otherwise stem the tide of violence at Limestone.

57.     Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer, and John Does 2-5 had long been on notice of the risks posed by high levels of violence at the facility.

58.     Alabama's prison homicide rate rose from 13 homicides per 100,000 people in prison in 2016 to 85 per 100,000 in 2019. In 2019, Alabama's prison homicide rate was more than seven times the national average.

59.     In October 2016, the United States Department of Justice ("DOJ") opened an investigation into whether the conditions in Alabama's prisons for men violated the Eighth Amendment of the U.S. Constitution. The DOJ investigation included inquiries into whether ADOC adequately protects prisoners from physical harm and sexual abuse at the hands of other prisoners and provides prisoners with safe living conditions.

60.     The DOJ's April 2019 Notice Letter, for example, notified Defendants that ADOC was violating the Eighth Amendment rights of prisoners by failing to prevent prisoner-on-prisoner violence and sexual abuse and failing to provide safe conditions to prisoners.

61.     The April 2019 Notice Letter went on to conclude that the constitutional "violations are severe, systematic, and exacerbated by serious deficiencies" including those in "ineffective housing and classification protocols"; "inadequate incident reporting"; "inability to control the flow of contraband into and within the prisons, including illegal drugs and weapons"; "ineffective prison management and training"; and "a high level of violence that is too common, cruel, of an unusual nature, and pervasive." And further, the DOJ apprised Defendants of the frequency with which prisoners are "found in unauthorized areas" and that "an excessive amount of violence, sexual abuse, and prisoner deaths occur within Alabama's prisons on a regular basis."

62.     In April 2017, an officer at Limestone saw a prisoner standing in a day room with multiple injuries to his head. The prisoner was escorted to the health care unit and then taken to an outside hospital for treatment for facial lacerations. The prisoner reported he had been attacked by another prisoner over a missing jug of julep (a prison-made alcoholic mixture).

63.     In August 2017, an officer used a chemical spray on a Limestone prisoner by spraying the chemical into the prisoner's cell tray and then closing the tray. While security staff

were taking the handcuffed prisoner to medical, the officer pushed the handcuffed prisoner and struck him several times.

64.     In December 2017, a prisoner at Limestone reported that two prisoners attempted to force him to perform oral sex, which resulted in a physical altercation, with a third prisoner coming to his aide. The incident was substantiated and the incident report notes that when one of the assailants was interviewed following the altercation, he had slurred speech and smelled of alcohol.

65.     In February 2018, a prisoner at Limestone reported that while he was working in the upholstery room, another prisoner grabbed his genitals and he responded by hitting the other prisoner in the face. The facility review of the incident revealed that prisoners did not need access to the space where the reported assault occurred.

66.     In August 2020, four prisoners at Limestone were involved in a knife fight that resulted in three being transported to an outside hospital for treatment.

67.     The violence at Limestone has continued unabated, and the DOJ filed a lawsuit on December 9, 2020.

68.     In December 2020, an inmate was stabbed multiple times in the early morning hours at Limestone and had to be transported to an outside hospital for treatment.

69.     In May 2021, a 58-year-old prisoner was choked to death at Limestone.

70.     In April 2021, a prisoner at Limestone was stabbed several times in the torso, arms, and legs. The prisoner was transported to an outside hospital for treatment.

71.     On June 16, 2022, Patrick Stinson was stabbed in the throat at and had to be transported to an outside hospital.

72.     In the summer of 2022, Vadarius Hall and Toby Davis were both victims of inmate-on-inmate assaults at Limestone.

73.     On July 30, 2022, Quinton Miller-Ivory was the victim of an inmate-on-inmate assault and transported to an outside area hospital.

74.     On August 1, 2022, James Kyle Tubbs was also a victim of inmate-on-inmate assault.

75.     On October 15, 2022, Kenyon Arrington was assaulted and killed.

76.     On January 6, 2023, Ariene Kimbrough was also stabbed and killed at Limestone.

77.     Despite having notice of the substantial risk of serious harm facing prisoners at Limestone in the time leading up to Plaintiff's assault at Limestone, Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer, and John Does 2-5 failed to take reasonable steps to address and reduce the risk of violence to prisoners such as Plaintiff at Limestone.

**Defendants' Failure to Address Threats or Incidents of Violence and Separate Vulnerable Prisoners from Those Likely to Commit Violence**

78.     In the period leading up to Plaintiff's assault at Limestone, Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer, and John Does 2-5 had an unreasonable and longstanding policy and practice of failing to protect prisoners from known threats to their safety, including by failing to discipline prisoners for acts of violence and possession of contraband, failing to identify and separate prisoners with a known history of violence or contraband possession from potential victims, failing to adequately respond to reports from prisoners that they feared for their safety, and failing to train and discipline subordinates whose known misconduct contributed to these policies and practices.

79.     Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer, and John Does 2-5 through their acts and omissions, failed to provide adequate supervision and monitoring of prisoners housed within Limestone to prevent violence.

80.     Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer, and John Does 2-5 maintained these policies and practices even though they knew that the failure to adequately respond to reports of safety concerns from prisoners and to identify, discipline and safely segregate predatory prisoners had contributed to violent incidents in the past, including those identified above.

81.     In the time period leading up to Plaintiff's assault murder at Limestone, ADOC staff failed to properly investigate and discipline acts of violence and possession of contraband weapons by prisoners at, emboldening violent prisoners and encouraging a culture of violence.

82.     Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer, and John Does 2-5 failed to create an established grievance system, limiting prisoners' ability to report threats of violence.

83.     Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer, and John Does 2-5 routinely retaliated against prisoners who reported violence and threats of violence by subjecting such prisoners to discipline in conjunction with the prisoners' reports of violence and threats of violence.

84.     In many cases, prisoners were subjected to discipline for refusing to name the individuals who they feared might harm them.

85.     This retaliation had the effect of deterring prisoners from reporting violence and threats of violence.

86.     Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer, and John Does 2-5 were aware that the failure to create an established grievance system and the response of ADOC staff to

reports of violence or threats of violence encouraged a culture of violence and impunity at Limestone and put prisoners like Plaintiff at risk of serious harm.

87.     In addition, Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer, and John Does 2-5 through their acts and omissions, failed to implement effective classification and housing policies, thereby resulting in violence caused by commingling prisoners who should have been kept separate.

88.     And when Plaintiff reported to Defendants McKenzie and Pelzer that he was physically assaulted, his requested placement to segregation (or, more appropriately, protective custody), was refused.

89.     Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer, and John Does 2-5 similarly failed to place Plaintiff's attackers in segregation, to discipline them, or otherwise to ensure that Plaintiff was safely housed so as to prevent violent incidents.

90.     These Defendants acted with deliberate indifference and their misconduct placed prisoners such as Plaintiff at substantial risk of serious harm and caused his injuries.

**Defendants' Failure to Provide Adequate Supervision and Monitoring**

91.     Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer, and John Does 2-5, through their acts and omissions, failed to provide adequate supervision and monitoring of prisoners housed within Limestone to prevent violence.

92.     Most of the time a single cube officer was the only officer monitoring an entire housing dormitory.

93.     The cube officers generally did not leave their cubicles.

94.     Oftentimes, the cube officers had not even undergone basic correctional officer training.

95.     The officers in the cubes were, at times, absent, asleep, on the telephone, or otherwise not paying attention to the prisoners they were charged with monitoring

96.     Random patrols of the dorms by additional officers occurred extremely infrequently.

97.     The housing dorms also lacked adequate surveillance cameras to monitor the housing units.

98.     Blind spots on the housing dorms, in concert with inadequate staff presence, officer inattentiveness, and the lack of surveillance equipment, created a further substantial risk of serious harm to prisoners such as Plaintiff and had contributed to numerous violent incidents in the years leading up to the sexual and physical assault of Plaintiff.

99.     Due to lax supervision, security staff at Limestone sometimes watched violent or troubling incidents unfold without intervening.

100.     Due to lax supervision, security staff at Limestone often failed to observe violent incidents and only discovered the victim after the violence and/or injuries had occurred.

101.     Due to lax supervision, security staff at Limestone failed to control the movement of prisoners between housing units, increasing the risk and frequency of violent incidents.

102.     Further, due to lax supervision, security staff at Limestone often failed to timely respond to prisoners who had been seriously injured in violent incidents, causing critical delays in the treatment of serious injuries.

103.     When Plaintiff was physically assaulted and raped on August 17, 2022, only a cube officer was present. Plaintiff was afraid to report the assault to the cube officer because the officer would most likely report whatever Plaintiff said back to his assailants.

104.     Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer, and John Does 2-5 were aware that the inadequate supervision and monitoring of prisoners at Limestone created a substantial risk of serious harm that facilitated and encouraged sexual abuse and assaults such as that suffered by Plaintiff.

105.     Despite this, Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer, and John Does 2-5, failed to improve supervision, monitoring, and control of movement at Limestone, and failed to train and discipline subordinates whose misconduct contributed to the lack of supervision and monitoring in the housing dorms.

## DAMAGES

106.     As a result of all of the Defendants' wrongful actions, Plaintiff was sexually assaulted, physically attacked, and extorted. Plaintiff suffered stress, fear, desperation, immense physical and emotional pain and terror.

## CLAIMS
### COUNT I
**Fourteenth Amendment, Procedural Due Process**
**Against Defendants Giddy and Roach**

107.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

108.     In violation of the Fourteenth Amendment's Due Process Clause, Defendants are each liable pursuant to 42 U.S.C. § 1983 for the reclassification of Plaintiff without due process.

109.     The transfer of Plaintiff to Limestone was atypical and severe, given the dangerous, unsafe, and unsanitary conditions he faced there.

110.     Plaintiff was denied a meaningful opportunity to contest the disciplinary charge brought against him because the officers had predetermined the outcome of the hearing.

111.    Defendants was the hearing officer at the disciplinary hearing and is liable for finding Plaintiff guilty without providing Plaintiff a meaningful opportunity to contest the charges against him.

**Count II**
**Eighth Amendment**
**Deliberate Indifference to Serious Medical Needs**
**Against Defendants Givens, Shafer, and John Doe I**

112.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

113.    As described more fully above, when Plaintiff entered the ADOC system he was diagnosed with an objectively serious medical need, opioid use disorder.

114.    As described more fully above, Defendants had notice of Plaintiff's medical needs and the seriousness of his medical needs, and they knew the risk of harm to Plaintiff's health if he did not receive adequate and immediate medical care. Despite that knowledge, Defendants did not provide Plaintiff with medication assisted treatment.

115.    Mr. Richmond's injuries were also proximately caused by the policies, practices, and customs of the Defendants.

116.    Defendants had knowledge that an epidemic of drug use and a lack of substance abuse treatment leads to a high number of prisoners, like Plaintiff, at risk of suffering relapses into drug usage or addiction. Defendants failed to offer Plaintiff MAT, forcing him to self-medicate.

117.    Defendants' response, punishing Plaintiff who suffered from opioid addiction, directly and proximately caused Plaintiff to be subjected to an unreasonable risk of serious harm, sexual and physical assault at Limestone, causing Plaintiff to suffer damages including pain, suffering, emotional distress and severe injury.

**Count III**
**Discrimination against Qualified Individual in Violation of the**

**Americans with Disabilities Act, § 504 of the Rehabilitation Act of 1973, and Section 1557
of the Affordable Care Act
Against Defendant ADOC**

118.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

119.    Defendant the ADOC is a public entity that receives federal funding and is subject to the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, and Section 1557 of the Affordable Care Act ("ACA").

120.    Defendants' conduct as alleged in this Complaint violates Title II of the Americans with Disability Act.

121.    The ADA protects qualified individuals with disabilities from discrimination.

122.    Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any such entity." 42 U.S.C. § 12132.

123.    Plaintiff, an individual with a diagnosed opioid use disorder, is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). Plaintiff is being denied adequate medical care, and reasonable accommodations for his disabilities under the ADA and § 504.

124.    By denying continuity of MAT to those in and entering their custody, Defendant engaged in discriminatory conduct in violation of the Americans with Disabilities Act, 42 U.S.C. § 12132.

125.    Defendant ADOC has been and are aware of all the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

**Count IV
Failure to Protect**

**Eighth Amendment (Supervisory Liability)**
**Against Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer and John Does 1-5**

126.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

127.    Pursuant to the Eighth Amendment of the United States Constitution, Plaintiff was entitled to be free from a substantial risk of serious harm while in the custody of the State.

128.    Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer and John Does 1-5 of and consciously disregarded the substantial risk that Plaintiff would be seriously harmed by prisoners in L dorm, failing to protect him from harm

129.    Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer and John Does 1-5, acting individually and in conspiracy with other Defendants, failed to protect Plaintiff.

130.    Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer and John Does 1-5 were aware of the widespread history of violence at Limestone and the substantial risk of serious harm facing prisoners such as Plaintiff.

131.    Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer and John Does 1-5 failed to take steps to ensure that threats or incidents of violence were adequately addressed and that vulnerable prisoners were separated from prisoners likely to commit violence, despite their responsibility to do so; perpetuated policies and customs of ignoring complaints of violence or retaliating against complainants, as well as housing vulnerable prisoners alongside prisoners with a history of violence; and failed to train and discipline subordinates who perpetuated those policies and customs.

132.    Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer and John Does 1-5 failed to failed to take steps to ensure that prisoners at Limestone were adequately supervised and monitored, despite their responsibility to do so; perpetuated policies and customs of leaving

housing units unsupervised; and failed to train and discipline subordinates who perpetuated those policies and customs.

133.   The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Plaintiff, and was objectively unreasonable.

134.   Defendants Toney, Crabtree, Streeter, McKenzie, Pelzer and John Does 1-5 misconduct directly and proximately caused Plaintiff to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries.

**Count V**
**Failure to Protect**
**Eighth Amendment**
**Against Defendants McKenzie and Pelzer**

135.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

136.   Pursuant to the Eighth Amendment of the United States Constitution, Plaintiff was entitled to be free from a substantial risk of serious harm while in the custody of the State.

137.   Defendants McKenzie and Pelzer consciously disregarded the substantial risk that Plaintiff would be seriously harmed by prisoners in L dorm, failing to protect him from harm.

138.   Defendants McKenzie and Pelzer were each made aware by Plaintiff and/or Plaintiff's mother that Plaintiff was being extorted, threatened, and physically assaulted. But Defendants failed to remove Plaintiff from L dorm, investigate who had assaulted him, or otherwise take steps to protect him, allowing him to be repeatedly assaulted and then extorted.

139.   The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Plaintiff, and was objectively unreasonable.

140.     Defendants McKenzie and Pelzer's misconduct directly and proximately caused Plaintiff to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries.

## DAMAGES

1.     Defendants' tortious conduct, as alleged herein, was a direct, proximate, and producing cause of the violation of Plaintiff's rights under the United States Constitution and of the following damages:

      a.   damages resulting from all harm Plaintiff suffered, including but not limited to:

           i.   conscious physical pain and suffering;

          ii.   physical injury and impairment;

        iii.   mental anguish and anxiety;

        iv.   loss of liberty;

      b.   punitive damages;

      c.   nominal damages;

      d.   any and all other damages, which will be more fully proven at trial, including for the intangible but concrete harms proximately caused by the violations of Plaintiff's rights under the Eighth Amendment, ADA, and § 504 of the Rehabilitation Act; and

      e.   all other forms of relief provided by law together with interest from the date of injury until paid, plus costs of these proceedings.

2.     Plaintiff is entitled to attorneys' fees under 42 U.S.C. § 1988, prejudgment interest, and costs.

All defendants are liable jointly, severally, and *in solido* as a result of their participation in the conduct giving rise to these allegations.

WHEREFORE, Plaintiff prays that after due proceedings in this Court, judgment be entered in favor of Plaintiff and against Defendants, jointly, severally, and *in solido*, for all such damages as are reasonable under the premises set forth herein, together with legal interest thereon from the date of judicial demand until paid; for all costs of this proceeding, as well as penalties and attorneys' fees to the extent applicable; and for all other relief to which Plaintiff may be entitled.

A jury trial is demanded.

Respectfully submitted this 29th day of July, 2024.

/s/ *Andrew Menefee*
Andrew Menefee
**MENEFEE LAW**
Alabama Bar No. 1529W23S
1250 Connecticut Ave NW
Ste. 700
Washington D.C., 20036
202-381-0143
amenefee@menefee-law.com
*Attorney for Plaintiff*